## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SHAIDON BLAKE,                          *

Petitioner,                            *

v.                                     *          Civil Action No. PWG-13-1160

JOHN WOLF, *et al.*,                   *

Respondents.                           *
                                      ***

## MEMORANDUM

After being sentenced to life in prison for conspiracy to commit murder, Shaidon Blake filed a Petition for Writ of Habeas Corpus, ECF No. 1, claiming ineffective assistance of trial court and appellate counsel, prosecutorial misconduct and trial court error.   The Attorney General of Maryland filed an initial response, ECF No. 17, and a supplemental response, ECF No. 29, and Petitioner filed a reply to the initial response, ECF No. 20, and a reply to the supplemental response, ECF No. 30.   A hearing is not necessary in this case.   *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*; Loc. R. 105.6 (D. Md. 2014);   *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).   In light of that determination, Petitioner's pending Motion for Appointment of Counsel (ECF No. 38) shall be denied.   *See* Rule 8(c), *Rules Governing Section 2254 Cases in the United States District Courts* (requiring appointment of counsel for qualifying petitioner if an evidentiary hearing is scheduled).   Because I find Blake's claims to be without merit, the Petition for Writ of Habeas Corpus shall be denied and a Certificate of Appealability declined.

**Background**

Facts Produced at Trial

Petitioner Shaidon Blake was indicted by a grand jury for murder, conspiracy to commit murder, and related offenses along with co-defendants Jermile Harvey and Janet Johnson.  Blake and his two co-defendants were accused of the murder of Terrance Randolph, whose burnt body was found in an alley of the 1900 block of Division Street in Baltimore on April 12, 2006.

Baltimore City Police Detective Darrell Merrick testified at trial that he had met with Blake and Raymond Kelly a couple weeks before the murder, on March 27, 2006, at Kelly's residence located at 1921 Division Street.  Merrick testified over objection regarding street gang practices as well as the organizational structure of a gang known as the Bloods.  Specifically, Merrick told the jury that there was an unauthorized splinter group of the Bloods established in Baltimore, about which the California Bloods were unhappy.  He further stated that during his meeting at 1921 Division Street, Blake admitted he was from California, was a member of the Bloods, and had come to Baltimore to straighten out members who were "not representing the Bloods the way they should be."[1] During his meeting with Blake and Kelly, Merrick noticed a samurai sword leaning against the wall in the living room. Apr. 4, 2007 Ct. Tr. 10–132, Supp. Resp. Ex. 11 (in court file).

Ronald Bolling, the Baltimore City police officer who first responded to the scene where Randolph's body was found, also testified at trial.  He responded to the 1900 block of Division Street after a report was called in that a dead body had been found in the alley.  Through Bolling, pictures of the area where the body was found and a close-up picture of Randolph's burnt body were identified and introduced into evidence.   Apr. 4, 2007 Ct. Tr. 135–49.

---

[1]   Merrick was accompanied at the meeting by another detective who did not testify at trial.

Jiordanna Wagner, the victim's girlfriend, was called as a witness by the state and initially refused to testify despite being granted immunity from prosecution by the State. Specifically, the State proffered that following Wagner's testimony the State would "nol-pros" her charges of accessory after the fact. Apr. 4, 2007 Ct. Tr. 158.   When Wagner refused to testify, the trial judge found her to be in contempt of court, and a second Baltimore City Circuit Court judge ordered that she be held in jail. After her attorney secured a grant of immunity from the federal government, Wagner appeared as a witness with an agreed-upon arrangement that her attorney could sit nearby to advise her if any questions asked would implicate her Fifth Amendment rights regarding other cases for which she had not been granted immunity.[2] Apr. 3, 2007 Ct. Tr. 8 –12, Supp. Resp. Ex. 10 (in court file); Apr. 4, 2007 Ct. Tr. 151–53, 158–59.

 When Wagner took the stand, she maintained that she could not remember the events taking place the night Randolph was killed, because she had been drinking and smoking marijuana and one year had elapsed. Additionally, she testified that she could not identify any person in the court room present on the night Randolph was killed.  Apr. 4, 2007 Ct. Tr. 162–66, 170–74.

The prosecution played part of a tape-recorded statement that Wagner had provided to Detectives Fata and Niedermeier of the Baltimore City Police,[3] and Wagner reluctantly identified

---

[2]  The trial judge reminded Wagner's counsel that she had been granted complete immunity and that the only time counsel's assistance would be needed would be if something unanticipated arose during her testimony. Apr. 4, 2007 Ct. Tr. 159.

[3] Blake's counsel raised objections to the admissibility of the tape because Wagner had not recanted, the statement was not under oath, it contained hearsay evidence regarding what Wagner had heard on the street, and the detectives questioning her were not present for purposes of cross-examination to establish if the statement was voluntary.  The objections were overruled, and the trial court told counsel that the detectives on the tape could be called as witnesses later so that defense counsel could cross-examine them.   The judge further ruled that the hearsay contained in the tape recorded statement was "linkage evidence" satisfying an exception to the hearsay rule.  Apr. 4, 2007 Ct. Tr. 177–83.

her own voice on the recording. *Id.* at 174–77.  In her recorded statement, Wagner, also known by the street name "Jade," explained that on April 11, 2006, Randolph,[4] Janet Johnson,[5] and another person known as "Bang Out"[6] were present at the scene when a man known as Danny Boy, a member of a set of the Bloods called "Piru," was stabbed on North Avenue for allegedly snitching about a prior shooting.[7]  She also told police that Blake[8] and Harvey[9] were present but did not actually stab Danny Boy; rather, Johnson and Randolph stabbed Danny Boy.  Wagner told police that, after the stabbing, she drove back to 1921 Division Street with Blake and Johnson in her cousin's car.  Randolph walked back to Division Street.  Apr. 4, 2007 Ct. Tr. 186–98.

Once at Raymond Kelly's house, Wagner, Kelly, Blake, Johnson, Harvey, Bang Out, and Randolph smoked marijuana together.  Wagner said Bang Out was angry at Randolph regarding drug money and Randolph's failure to help Bang Out when he was confronted by members of a rival gang.  The argument between Blake, Bang Out and Randolph continued in the basement. Later, Bang Out came upstairs and summoned Wagner, Johnson, and Harvey to the basement, where Wagner said she witnessed Bang Out and Johnson kicking and punching Randolph, but Randolph did not fight back.  Wagner said that Bang Out told her and Johnson to go back

---

[4]  Randolph was also known as "Sky" and "Sleepy." Apr. 4, 2007 Ct. Tr. 192.

[5]  Johnson is also known as "J" and "Lock and Load."  Wagner told police that Johnson is a member of the BHB or Bounty Hunter Bloods. Apr. 4, 2007 Ct. Tr. 194.

[6]  The person known by the street name Bang Out was not prosecuted in the case against Blake, Johnson, and Harvey.  His true identity is never revealed in the course of the trial, but at Blake's post-conviction hearing it is revealed that "Bang Out", whose real name is Nicholas Floyd, was arrested, and later convicted, on different charges of murder.  Mar. 29, 2011 Hr'g Tr. 7, 72, Supp. Resp. Ex. 19 (in court file).

[7]  The prior shooting is referred to in transcripts as the "Bloody Jesus" killing.  Apr. 4, 2007 Ct. Tr. 217–18.

[8]  Blake is also known as "Don Papa."  Apr. 5, 2007 Ct. Tr. 230–33.

[9]  Harvey is also known as "Smiley."

upstairs where they stayed for "a little while" before Harvey joined them upstairs.  Apr. 4, 2007 Ct. Tr. 198–201.

Wagner, Johnson, and Harvey were then told to go back into the basement.  Wagner said Bang Out had gotten duct tape from upstairs at some point and used it to tape Randolph's arms down.  She stated that Randolph offered no resistance to being bound with the duct tape and was still talking to them.  At this point, Wagner said that Blake was simply watching what was going on, but she could not remember if he said anything.  After taping Randolph, Bang Out handed Harvey a box cutter, which he used to cut Randolph's head and neck.  According to Wagner, Bang Out also had an issue with Harvey and handed him the box cutter to "prove himself."  Wagner told police that Randolph was still alive at this time and that Bang Out and Johnson also cut Randolph on his head.  Wagner stated that, at one point, Blake went upstairs to get Raymond Kelly and brought him down to the basement to show him what was happening, but Kelly left shortly after he saw what was going on.  Apr. 4, 2007 Ct. Tr. 201–04.

Wagner's statement continued as follows:

> At some point, I can't remember exactly where he (sic) came from, [Harvey] had a sword and he went up to, to stab [Randolph] as they, in his side with a sword.  It didn't, it didn't go through . . . they like pokin' him.  Then [Randolph] had, already had cuts on his head from, from the other little box cutter thing and [Harvey] said destroy and he put it, he put it to [Randolph's] back and he basically like pushed it into his neck or whatever.  Bang Out came over as well and he, he kicked the sword to make it go deeper into [Randolph's] neck.  At this point, [Randolph] . . . well, I thought, I thought [Randolph] was dead 'cause like when he pushed on it with the sword or whatever, he was, he was kickin' or whatever, kickin' his legs.  And after that, I do know that [Johnson] (unintelligible) [Randolph] like 'cause she had it, she was playin' with it in, in his neck.

*Id.* at 204–05.

Wagner told police that while the sword was in Randolph's neck he continued to kick and make noises, but when it was removed there was a hole in his neck and he stopped moving.  She

said that after that, they left him alone and began smoking more marijuana.  *Id*. at 205–06.   She said Bang Out continued to poke Randolph with the sword, but Randolph did not move and everyone assumed he was dead and they left the basement.  She said that "everyone" included Johnson, Blake, Harvey, Bang Out, and herself. *Id*. at 206.  According to Wagner, Blake and Bang Out were in the basement while she was upstairs with Harvey and Johnson; Blake and Bang Out told them not to leave the house.  A short time later, Blake came upstairs and asked Johnson to go outside and stand at the top of the street to see if she could see anyone and Wagner guessed they were cleaning up and wanted to move Randolph's body out of the house.  *Id*. at 208.  She claimed she went outside to sit in her car, where she waited.  She said she overheard Blake and Harvey saying that the body was not moved properly because it was still in the back alley.  *Id*. at 209.  Wagner insisted that she did not know who moved the body because she was not present when it was moved.  *Id*.

During her taped statement to the police, Wagner verified photographic arrays used when she identified Johnson, Harvey and Blake, among others.  Wagner stated that no one present in the basement tried to help Randolph, nor did they suggest that the assault on him stop.  She claimed she did not attempt to help him because she was afraid she would be killed too.  Apr. 4, 2007 Ct. Tr. 222–23.  Additionally, Wagner stated that Bang Out and Johnson knew where her mother lived.  *Id*. at 223–24.

After the tape-recorded statement was played for the jury, Blake's counsel moved for a mistrial because of numerous instances of "double hearsay and triple hearsay" contained within the statement.  *Id.* at 227–29.  Specifically, defense counsel took issue with Wagner's statement that Danny Boy had been attacked because he "snitched" about the shooting of a man named Jesus.  *Id.* at 231.  When the detectives asked Wagner to clarify that statement, she admitted that

it "was the word . . . on the street." *Id.* The trial court denied the motion for mistrial on the basis

that the hearsay would be substantiated by the time all of the witnesses had testified. *Id*. at 228–

31.

In response to questions from the court, Wagner claimed she did not recall making the

statement to police, which had just been played for the jury. She further claimed she was "very

much threatened by the police" and that during the tape-recorded statement she felt threatened by

the officers "in an indirect way." Apr. 4, 2007 Ct. Tr. 232 –33. She explained that police

threatened to send her to jail and that they were going to question her mother and throw her in

jail too. *Id*. at 233–34. On cross-examination by Blake's counsel, Wagner again claimed she did

not recognize Blake as the man known as Don Papa (the name Blake testified he used, Apr. 5,

2007 Ct. Tr. 230–33) who was in the basement where Randolph was killed. *Id*. at 234–35.

During further cross-examination of Wagner by counsel for Harvey, it was developed

that she had been arrested, or told she was under arrest, on the night she provided the statement

to detectives and that she was held for almost three hours before the recorded statement began.

Apr. 4, 2007 Ct. Tr. 236–39. Wagner claimed she was being interrogated the entire time she was

in custody, her mother did not know she was there, and she was not permitted to call her mother

until after she provided the recorded statement. *Id*. at 239–47. Additionally, Wagner was

questioned about the grant of immunity she was given and how she had been told that she would

be prosecuted as an accessory after the fact in the context of this case. *Id*. at 247–51. Wagner

also claimed she would not testify as to the statements made in the recording, because she did not

want to be guilty of perjury as those statements were not true and were made under duress. *Id*. at

252–55.

Detective David Bower, who was assigned to the Mobile Crime Unit at the time of the offense, was called as a witness by the state.  Apr. 4, 2007 Ct. Tr. 266.  Bower was the crime lab technician assigned when a warrant to search 1921 Division Street was executed.  He is the technician who recovered a knife found stuck into the basement steps at the house; it was offered into evidence without objection.  *Id.* at 268.  In addition, Bower recovered five red bandannas, three black bandannas, two pieces of duct tape, and something that appeared to be hair.  *Id.*  A picture that Bower had taken of the front room of the house, where the items were found, was introduced into evidence without objection. Bed sheets and a quilt, later identified as matching the pattern of the sheets found wrapped around the victim's body, were recovered from the house and introduce through Bower's testimony.  *Id.* at 268–75.  Although Bower testified that what looked like a fingerprint in dried blood was found on a column, he explained he was not a latent print expert and did not process it for purposes of possible identification.  Rather, the column was cut and removed from the house for purposes of processing by the evidence control unit.  Bower admitted, however, that he was the only technician on site deciding whether there were latent prints on surfaces to be processed.  *Id.* at 277–79.  On cross-examination, Bower admitted that he did not make a request to have the knife recovered from the stairs processed for fingerprints.  *Id.* at 281–83.

Raymond Kelly, the owner of 1921 Division Street, testified that Blake, who is his cousin, arrived unexpectedly at his house on November 5, 2005.  Apr. 5, 2007 Ct. Tr. 12–15, Supp. Resp. Ex. 12 (in court file).  He claimed he did not know why Blake had come to Baltimore, but that Kelly arranged a meeting at his house between Baltimore City police and Blake near the end of March 2006. *Id.* at 15–17.  He explained that Blake wanted the meeting because the police were coming down hard on the gangs, Blake intended to set up an annual

meeting, and he wanted to tell the police that they were trying to exert control over what was going on in Baltimore. *Id*. at 18. Kelly maintained that the only reason he was at the meeting was that it took place at his house. *Id*. at 17.

Kelly testified that on the night of April 11, 2006, he arrived home at approximately 9:30 or 10:00 at night to find several people there, including his godson Jermile Harvey, who had been living at his house for a couple of months. Apr. 5, 2007 Ct. Tr. 19–20. Also present, according to Kelly, were Janet Johnson, Bang Out, and others whom he did not identify by name. Kelly recalled smoking pot and drinking for a couple of hours before going to bed. At approximately 3:00 in the morning he was awakened by Bang Out, who told Kelly to come down to the basement and to hurry. *Id*. at 22. When he arrived in the basement Kelly said that Johnson, Harvey, Blake and Wagner were present along with Bang Out. *Id*. at 22–23. He testified that there was a man in the basement "taped up" who had not been in the house prior to Kelly going to bed. *Id*. at 23. Kelly stated that Randolph was taped across the chest and his hands were taped behind him and to his sides. *Id*. He claimed that when he saw this he told Blake to get "this outta here." *Id*. at 24. Kelly further claimed he did not want to know what was going on, but when he said he wanted everything out of the house Bang Out addressed Randolph telling him they were just playing and would let him go. *Id*. At that point, Kelly said he observed Blake "nudge" Randolph with a sledge hammer when Randolph moved. *Id*. Kelly said he went back upstairs after telling Blake to get everything out of his house. Kelly further testified that a couple of hours later, Blake came to his room, apologized, and told him things got out of control, but that everything was taken out of the house. *Id*. at 26.

Following his encounter with Blake, Kelly explained he left his house at 7 a.m. to go to work as a contractor at a church down the street. Apr. 5, 2007 Ct. Tr. 26–27. The following

Sunday, police officers came to Kelly's house and kicked in the door, shouting "police warrant." *Id*. at 28.  Kelly was placed in handcuffs and was taken to the Homicide Unit for questioning, where Kelly denied knowing anything about what had occurred.  He returned home after being questioned for a few hours.  *Id*. at 28–31.  Kelly was later arrested and charged as an accessory after the fact in the murder of Terrence Randolph.  *Id*. at 31.  After his arrest, Kelly told police everything he witnessed on the night Randolph was murdered and identified Blake in a photographic line-up.  *Id*. at 31–34.   Kelly wrote a statement on the back of the photo array which he read into the record:

> When I came into the basement, [Blake] was standin' by the dryer holdin' a sledgehammer.  I immediately told him to get this outta my house, at which time he tried to convince me that he could bury the guy in the basement.  I refused and told him to make this right.  When I was goin' back upstairs, [Blake] pushed the victim against the wall with the sledgehammer.

*Id*. at 35.  Kelly explained that he had recently purchased a new furnace and the old furnace had left a hole in the floor and that he assumed Blake was simply attempting to scare Randolph by making the statement about burying him in the hole in the basement floor.  *Id*. at 36.  Kelly maintained that Randolph was still alive at the time this conversation took place.  *Id*.

During his direct testimony, Kelly confirmed he had signed a plea agreement with the State ten days after he had been released from Baltimore City Jail, where he had been confined from June 15 to October 15, 2006.  Apr. 5, 2007 Ct. Tr. 48–53.  The terms of the agreement required Kelly to testify to everything he saw and, in exchange for his testimony, he would receive three years of probation with a five year suspended sentence.  *Id*. at 53.  Kelly further testified that the Samurai sword had been at his house, and maintained that he had told everyone he was not allowing gang activity at his house approximately two weeks prior to the murder.  *Id*. at 60.  He testified he did not know who brought the sword to his house.  *Id*. at 61.

On cross-examination by counsel for Blake, Kelly admitted he had in the past been convicted of possession of heroin and that he had a drug addiction. *Id.* at 66–67. Kelly's credibility was challenged regarding his failure to intervene on behalf of Randolph and his seemingly apathetic attitude about someone dying in his house. *Id.* at 68–73. Cross-examination of Kelly also revealed he had been incarcerated prior to agreeing to cooperate with the police in this case and was released immediately upon his agreement. *Id.* at 90–92. On redirect, Kelly testified he was not happy about testifying against his godson (Harvey), his cousin (Blake) or Johnson. *Id.* at 113.

John French of the Baltimore City Police Department's Mobile Unit of the Crime Laboratory testified regarding his participation in the execution of the search and seizure warrant for 1921 Division Street. Apr. 5, 2007 Ct. Tr. 118–19. He stated that his processing of the crime scene was limited to the basement of the house. *Id.* at 119. Photographs taken of the basement, depicting three bleach bottles and one gasoline can, were introduced into evidence through French. *Id.* at 119–24. After the photographs were introduced, French identified a sealed evidence bag which contained the bleach bottles and gasoline can found in the basement. *Id.* at 125. The evidence bag, as well as the photographs, were entered into evidence without objection from the defense. *Id.*

Also introduced through French were photographs of the water heater, washer, and dryer, where blood evidence was believed to be found. *Id.* at 126–27. The presence of blood on the dryer and a hutch was confirmed by a presumptive test using a chemical known as Leucomalachite.[10] *Id.* at 130–31. French next performed a luminol test[11] on two hot water

---

[10] The test involves swabbing an area suspected for the presence of blood. A positive reaction causes the swab to change to a blue-green color. Apr. 5, 2007 Ct. Tr. 129.

heaters, the dryer, the washing machine, the front of the hutch, and the south wall of the basement next to the dryer. *Id*. at 133–34.   The luminol showed the presence of blood on all of the areas tested. *Id*. at 135–40.   On cross-examination, it was established that no fingerprint evidence had been collected because the crime had occurred a month earlier. *Id*. at 140–45.

Detective Anthony Fata, who worked in the Baltimore City Police Department's Homicide section, testified regarding his investigation in the case, which started when he was called to the scene where the body was discovered. *Id*.  at 149–50.  Fata also was present for the execution of a search warrant for the residence on Division Street and confirmed that police recovered from the house duct tape, eight bandannas, and a cell phone bill.  Police also removed a portion of a pillar in the front room that was believed to have bloody prints on it.  Fata further stated that blood swabs were taken from the kitchen.  An "exacto" knife, found sticking into the framing of the steps going to the first floor, was recovered and a portion of the rear basement door was cut out and removed.  Apr. 5, 2007 Ct. Tr. 163–64.

Wagner was interviewed by Fata at the homicide unit when Wagner's mother brought her in to the station.  Fata testified that while Wagner's mother was in the police station, she was not in the room where Wagner was questioned by police.  Fata explained Wagner's rights to Wagner and testified that he did not threaten her in any manner.  Fata stated that, after talking to Wagner, Janet Johnson was brought in for questioning. *Id*. at 164–76.   A tape-recording of Fata's interview of Blake in Las Vegas, Nevada, was then played for the jury.

Blake was interviewed on May 19, 2006, in the Clark County Detention Center, where Blake was being held by Nevada police.  Apr. 5, 2007 Ct. Tr. 177.  Blake, who was using the name Shamvoy Smith at the time of his arrest in Nevada, waived his *Miranda* rights and

---

[11]   Luminol is a chemical sprayed directly on the object and a positive reaction causes the residual blood to glow in the dark. *Id*. at 132.

explained when he was arrested that he was with associates from a gang intervention program with whom he shared a hotel room. *Id*. at 180–81.   Blake admitted he was in Baltimore and that he stayed at Kelly's house at 1921 Division Street. *Id*. at 192–93.   He went on to explain that none of the Bloods in Baltimore were legitimate in the eyes of the California Bloods and the he "earned his way in" to the Bloods. *Id*. at 194–202.   Blake admitted knowing Jada and someone named "Bang Out" but denied knowing his real name. *Id*. at 198, 203.   Blake related that he was present in the area when "Danny Boy" was stabbed and had ridden in a car with Jada to North Avenue where the stabbing occurred.   In addition, he said Harvey was present and, after identifying a picture of Terrence Randolph, confirmed he was also present. *Id*. at 206–10.   Blake said that when things "sparked off," everyone left in Jada's car and went to Kelly's house on Division Street. *Id*. at 210.   Blake claimed he remained there for approximately fifteen minutes, left to retrieve his gun, and did not return. *Id*. at 214–15.   He further maintained he was not present for and did not participate in the murder of Randolph.   When asked why he was sitting on the front porch of 1921 Division Street on the day the body was found, Blake claimed he had received a package containing heroin. *Id*. at 221–25.   During the course of their conversation with Blake, Fata and Detective Jones[12] advised him that he was being charged with first degree murder in Maryland and asked him about convictions he had in California for robbery and in Florida for drug offenses. *Id*. at 225–30.     Blake also admitted to using the names Shaidon Blake, DeMarvin Smith, and Don Papa. *Id*. at 230–33.

On June 2, 2006, following Blake's interview in Las Vegas, he was extradited to Baltimore, Maryland by the fugitive unit of the Baltimore City Police Department.   Apr. 10, 2007 Ct. Tr. 61, Supp. Resp. Ex. 13 (in court file).   Blake was interviewed again in Baltimore on

---

[12]   Jones was never called as a witness during the trial.

June 5, 2006, by Fata. After Blake waived his *Miranda* rights, Fata spoke with him regarding follow-up questions that were raised between the time of the Las Vegas interview and his extradition to Baltimore. *Id*. at 62–65. The recorded interview was played for the jury. During the interview, Blake insisted that his arrest was unfounded and that there was no physical evidence tying him to the crime. He explained to Fata that his trip to Las Vegas was for the purpose of seeing his three kids. He maintained that the only reason he knew Randolph had been killed is that others had told him about it, but that he was not present in the house on the night he was killed. He maintained that Kelly told him Randolph was "DP'd," or disciplined, the night he was murdered. When pressed on what specifically Blake knew about the murder, he said he assumed Randolph had been shot. Blake further claimed that once he found out about the murder, he decided to get as far away as possible and that he needed to transport heroin back "home." Blake explained that the biggest heroin market he had was in Baltimore on Pennsylvania Avenue and that a murder would hurt his business, so he was not interested in participating in such a crime. Apr. 10, 2007 Ct. Tr. 61–111.

After the second interview with Blake, an effort to locate Raymond Kelly was undertaken and he was found on June 15, 2006.[13] At that time, Kelly identified the people who were involved in Randolph's murder through a photographic array. Apr. 10, 2007 Ct. Tr. 112. Harvey, who was identified by the street name Smiley, which was tattooed across his neck, was picked up by the police following Kelly's identification. *Id*. at 113. In addition, Fata testified about Wagner's interview, during which she identified Blake as one of the people involved in Randolph's murder. *Id*. at 114–19.

---

[13] Fata explained during cross-examination that he had Kelly located because he feared for Kelly's life. Apr. 10, 2007 Ct. Tr. 142–44.

Detective Fata was also cross-examined about the conditions under which Wagner was questioned; the size of the room where she was held; and whether her mother was permitted to accompany her.  Wagner was held in the interrogation room for over two hours, during which nothing was recorded because Wagner was simply sitting there in the room without responding to anything said to her and that her mother was not there because he felt her mother would coddle her.  Apr. 10, 2007 Ct. Tr. 162–78.  Fata also was asked by counsel for Jermile Harvey why DNA samples were taken from Harvey days before trial and eleven months after his arrest. *Id*. at 189–94.  Counsel made the point that if those DNA results exonerated the defendants, the results would not be available to the jury.  *Id*. at 192.

The final witness called by the state was Zabiullah Ali, M.D., the Assistant Medical Examiner for the State of Maryland.  Apr. 10, 2007 Ct. Tr. 209–26.   Dr. Ali performed the autopsy on Randolph on April 13, 2006.  *Id*. at 211.  He testified that Randolph suffered thirty-seven cutting and slashing wounds to the scalp, face, head, neck and chest, as well as two stab wounds to the front of the right side of his neck and one to the left side of his neck.  *Id*. at 212–13.  He further testified that there was evidence of blunt force trauma because his nose was broken, the upper lip was torn, and multiple upper teeth were broken.  *Id*. at 213.  There was also evidence of asphyxia, or pressure being applied to the neck.  *Id*.  Dr. Ali further testified that there was evidence that Randolph may have attempted to remove the duct tape from his hands, as two of his fingernails were broken.  *Id*. at 214. He explained that the stab wounds to Randolph's neck injured the jugular vein and that at the time his body was set on fire, he was already dead, as evidenced by the lack of soot or carbon monoxide in Randolph's airways.  *Id*. at 218–19, 223. Defense counsel for Janet Johnson asked the only cross-examination questions of Dr. Ali, which

elicited an admission that no DNA tests were done of Randolph's fingernail clippings despite evidence some wounds to his fingers appeared to be defensive in nature. *Id.* at 226–28.

As to the charges against Blake, the jury returned a verdict of not guilty on first degree murder; guilty as to second degree murder; guilty on conspiracy to murder; and not guilty on the weapons charges. Apr. 13, 2007 Ct. Tr. 8–9, Supp. Resp. Ex. 16 (in court file). As to his co-defendants, the jury found Johnson and Harvey guilty on all charges. *Id.* at 10–13. The jury was polled and each juror confirmed the verdicts. *Id.* at 13–14. Blake was sentenced to life in prison for conspiracy to commit murder.[14] May 30, 2007 Ct. Tr., Supp. Resp. Ex. 17 (in court file).

<u>State Court Review</u>

On direct appeal to the Maryland Court of Special Appeals, Blake raised two claims:

> Did the trial court err in admitting [Blake's] statements when the State, at the suppression hearing, did not sustain its "heavy burden" of showing both the advisement and waiver of [Blake's] *Miranda* rights?

> Did the trial court err in admitting the tape-recorded statement of Jiordanna Wagner without first making a "preliminary finding" that "her lack of memory of the events in question was not actual but a contrivance?"

*Blake v. Maryland*, No. 989, slip op. at 2 (Md. Ct. Spec. App. Mar. 19, 2009), Resp. Ex. 2, ECF No. 17-2. Blake's convictions were affirmed in an unreported opinion issued by the Court of Special Appeals on March 18, 2009. *Id.* Blake's Petition for Writ of Certiorari, Resp. Ex. 3, ECF No. 17-3, was denied by the Court of Appeals on June 19, 2009, Resp. Ex. 4, ECF No. 17-4. Blake did not seek further review with the United States Supreme Court.

On July 21, 2009, Blake filed a petition for post-conviction relief in the Circuit Court for Baltimore City. *See Blake v. Maryland*, No. 106177028-29, slip op. at 1–2 (Md. Cir. Ct. Balt. City Aug. 8, 2011) ("Cir. Ct. Mem. Op. & Order"), Resp. Ex. 5, ECF No. 17-5; Mar. 29, 2011

---

[14]   Blake's second degree murder conviction merged with the conspiracy count.

Hr'g Tr., Supp. Resp. Ex. 19 (in court file).   In his self-represented petition which was later

amended by counsel, Blake raised the following grounds for post-conviction relief:

(A) ineffective assistance of trial counsel:
> (1) failure to object to a voir dire method that deprived him of a fair and impartial
> jury;
> (2) eliciting and failing to object to admission of "other crimes" evidence and
> prejudicial hearsay,
> (3) failure to object to the State's statement in closing argument implying the defense
> had to prove certain facts;
> (4) failure to object to the inconsistent verdict finding Blake not guilty of first
> degree murder, but guilty of conspiracy to commit murder; and
> (5) the cumulative effect of these errors.

(B) appellate counsel was ineffective for failing to raise meritorious issues on appeal;

(C) the trial court violated his constitutional rights by admitting hearsay;

(D) the trial court abused its discretion by
> (1) coercing a witness to testify,
> (2) asking excessive questions,
> (3) improperly instructing the jury,
> (4) admitting inadmissible evidence over objection,
> (5) improperly entering a replacement tape into evidence, and
> (6) denying the motions for severance;

(E) the State committed misconduct by
> (1) improperly withholding exculpatory evidence,
> (2) coercing the testimony of Jiordanna Wagner,
> (3) knowingly using false testimony, and
> (4) making an improper burden shifting closing argument; and

(F) the evidence was insufficient to sustain the conviction.

Supp. Resp. Exs. 20–22 (in court file).

In a memorandum opinion and order filed August 8, 2011, which is discussed more fully

below, the state court denied post-conviction relief.   Cir. Ct. Mem. Op. & Order 28.   Blake

appealed the denial of post-conviction relief to the Maryland Court of Special Appeals.   App. for

Leave to Appeal, Resp. Ex. 6, ECF No. 17-6.   His application for leave to appeal was denied in

an unreported opinion dated December 19, 2012.  Mandate, Resp. Ex. 7, ECF No. 17-7.  The

court's mandate issued on January 22, 2013.  *Id.*

<u>Claims Raised in this Court</u>

Blake raises the following claims for this Court's consideration:

A.  The prosecution failed to disclose DNA reports, knife evidence, and the name of an alternative suspect in the case;

B.  Violation of rights to due process and equal protection through the admission of hearsay and other crimes evidence;

C.  Trial counsel rendered ineffective assistance by (1) failing to object to admission of DNA evidence, (2) eliciting and failing to object to admission of "other crimes" evidence and prejudicial hearsay, (3) failing to object to the circumstances surrounding Wagner's testimony, (4) failing to object to "3 large brown paper bags" being displayed before the jury and the use of co-defendants to corroborate each other, (5) providing a prejudicial statement to the media, and (6) failing to consult with him adequately and prepare an adequate defense;

D.  Appellate counsel was ineffective for raising frivolous issues and not raising meritorious issues;

E.  The State made improper closing argument by (1) shifting the burden of proof and (2) providing misleading and false argument;

F.  The trial court (1) gave improper jury instructions on "mere presence" and (2) improperly admitted Wagner's pretrial statement;

G.  The evidence was insufficient to sustain his convictions; and

H.  The State tampered with witnesses.

Mem. in Supp. of Pet. 1–7, ECF No. 1-1.

## **Exhaustion**

A petitioner must exhaust all of his state remedies before seeking federal habeas relief.

*See Rose v. Lundy*, 455 U.S. 509, 515 (1982).  Therefore, when filing a federal habeas corpus

application under 28 U.S.C. § 2254, a petitioner must show that all of his claims have been

presented to the state courts.  28 U.S.C. § 2254(b) and (c); *see also Preiser v. Rodriguez*, 411

U.S. 475, 491 (1973).  This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider it.  *See Ex parte Hawke*, 321 U.S. 114, 116–17 (1944). For a person convicted of a criminal offense in Maryland this may be accomplished either on direct appeal or in post-conviction proceedings.

To exhaust a claim on direct appeal in non-capital cases, it must be raised in an appeal, if one is permitted, to the Maryland Court of Special Appeals and then to the Maryland Court of Appeals by way of a petition for writ of certiorari.  *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201 and 12-301.  If an appeal of right is not permitted, as in cases where a guilty plea is entered, exhaustion can be accomplished by filing an application for leave to appeal to the Court of Special Appeals.  Cts. & Jud. Proc. § 12-302(e).  If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted.  *Id.* § 12-202. However, if the application is granted but relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Court of Appeals.  *See Williams v. State*, 438 A.2d 1301, 1305 (Md. 1981).

To exhaust a claim through post-conviction proceedings, it must be raised in a petition filed in the Circuit Court and then in an application for leave to appeal to the Court of Special Appeals.  Md. Code Ann., Crim. Proc. § 7-109.  If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted.  Cts. & Jud. Proc. § 12-202.  However, if the application is granted but relief on the merits of the claim is denied, the petitioner must file a petition for writ of certiorari to the Court of Appeals.  *See Williams*, 438 A.2d at 1305.

In their initial response to the Blake's Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254, Respondents asserted that he had included "at least five" claims that were

19

not yet exhausted, requiring dismissal of the entire Petition if Petitioner did not waive review of the unexhausted claims.  Resp. 1, 13.  Petitioner was provided an opportunity to either withdraw the entire petition or waive review of the unexhausted claims. Order, ECF No. 18.  Petitioner indicated that while he did not believe the five specified claims were not properly exhausted, he would nevertheless waive review of "any issue" that this Court found to be unexhausted.[15]  Resp. to Ct. Order 1, ECF No. 21.  Respondents were directed to file an Answer addressing the merits of Petitioner's claims, together with a complete record of the proceedings in state court.  Order, ECF No. 22.

Blake did not raise the following claims in state court:

(1)     Trial counsel was ineffective for (a) failing to object to "DNA evidence being presented that [he] did not have access to," (b) failing to object to "3 large brown paper bags" being displayed before the jury; (c) making a prejudicial statement to the media that he "did not believe" Blake, allegedly indicating a lack of zealous representation of

---

[15] Although Respondents only specifically identified five unexhausted claims, they argued that "Blake's underlying petition raises *at least* five claims that were not pursued by him in state court" in their initial response, Resp. 14–15 (emphasis added), and later identified other claims that were "not pursued by Blake in all appropriate state courts," Supp. Resp. 27, or "to the extent raised in state court, . . . unsubstantiated and/or waived," Supp. Resp. 36, putting Petitioner on notice of the extent of their waiver argument. *See also*, *e.g.*, Supp. Resp. 19 (arguing that allegation that "[r]equested DNA records were withheld . . . is waived"). Moreover, after insisting that "[e]vidence for all 5 issues the state claims to not be exhausted has been presented in petitioners response to respondents claims," Blake then waived review of "*any issue this Honorable Court deem[s] to be not fully exhausted*," Resp. to Ct. Order 1 (emphasis added). Respondents' assertion that "Blake has indicated that he waives all unexhausted claims *other than his claim that the State tampered with witnesses*," Supp. Resp. 13 (emphasis added), is incorrect, as Blake specifically waived that claim, *see* Resp. to Ct. Order 2–3.

Blake at trial;[16] and (d) inadequately preparing for trial by meeting with him only twice

prior to trial, for a total of approximately twenty minutes, Mem. in Supp. of Pet. 3–4, and

(2)     The trial court erred in admitting the testimony of Blake's co-defendants Wagner

and Kelly without corroboration, and in instructing the jury that "other evidence is

needed to show that the defendant committed the crime, was with others who committed

the crime at the time and place crime was committed," which, in Blake's view, confused

the jury, blurred the line regarding "mere presence," and made it impossible for the jury

to make a correct analysis of the facts, *id.* at 4–6.

*See* App. for Leave to Appeal; Cir. Ct. Mem. Op. & Order.  These claims, therefore, are waived

as unexhausted.  *See Ex parte Hawke*, 321 U.S. at 116–17; Resp. to Ct. Order 1 (waiving review

of any claims that this Court finds unexhausted).

Blake asserts that he raised his claim regarding the display of the paper bags in his "leave

to appeal." Pet.'s Reply to Resp. 3.  But, review of the Application for Leave to Appeal reveals

that he did not.  *See* App. for Leave to Appeal.  And, even if he had raised the claim regarding

the jury instructions in post-conviction proceedings, it would have been rejected as waived for

failure to raise it on direct appeal, *see* Crim. Proc. § 7-106(b)(1)(i)(3), amounting to a procedural

default, or bar to the claim, for purposes of federal habeas review.[17]  *See Breard v. Pruett*, 134

---

[16] The post-conviction court did, however, make clear that counsel's strategy at trial was to
convince the jury that Blake's statements to police regarding his importance in the gang were
exaggerations.  Thus, to the extent the claim was raised, but not addressed, the post-conviction
court did not err in finding that counsel was not ineffective for choosing one strategy in lieu of
another, *see Wilson v. United States*, No. PJM-12-1136, 2014 WL 1292224, at *3 (D. Md. Mar.
27, 2014), and there is no basis for relief stated.  *See* 28 U.S.C. § 2254(d)(1).

[17] Certainly, even if a procedural default has occurred, a federal court may address the merits of a
state prisoner's habeas claim if the petitioner shows (1) both cause for the default and prejudice
that would result from failing to consider the claim on the merits, or (2) that failure to consider
the claim on the merits would result in a miscarriage of justice, i.e., the conviction of one who is

F.3d 615, 619 (4th Cir. 1998) ("A procedural default . . . occurs when a habeas petitioner fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991))). Therefore, neither argument alters my conclusion that Blake waived these claims. *See Ex parte Hawke*, 321 U.S. at 116–17.

### Stay and Abeyance

Following his waiver of review of "any issue" this Court found unexhausted, Petitioner filed a Motion to Supplement seeking stay and abeyance. Mot. to Supp., ECF No. 23. Petitioner asserted that new evidence regarding the criminal prosecution of one of the detectives[18] involved in Petitioner's case entitled him to stay and abeyance on the unexhausted claim of witness tampering. *Id.* This Court granted Petitioner's Motion to Supplement to the extent that Respondents should address the merits of his assertion that he is entitled to stay and abeyance for the witness tampering claim. ECF No. 24.

The claim he raised was that Detective Fata was found guilty of engaging in worker's compensation fraud when he self-inflicted a gunshot wound and claimed he had been shot in the line of duty. Mot. to Supp. 1–2. Blake asserts that this conduct impacts on his criminal conviction because Fata is now established to be a dishonest person who likely lied in the context of testifying in Blake's trial. *Id.* at 2. To the extent the "evidence" pertaining to Detective Fata's

---

actually innocent. *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986). "Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court at the appropriate time." *Breard*, 134 F.3d at 620 (quoting *Murray*, 477 U.S. at 488). Blake has not shown cause or established his actual innocence, and therefore this Court may not reach the merits of this claim. *See Murray*, 477 U.S. at 495–96.

[18] According to a newspaper article submitted by Petitioner, Fata shot himself in the leg in order to fraudulently claim worker's compensation and provided a false statement alleging he had exchanged gunfire with an armed black man. Mot to Supp. Ex. AA, ECF No. 23-1.

conviction is newly discovered, this Court will presume for purposes of this analysis that Blake was diligent in discovering the existence of that evidence.

Stay and abeyance is not permitted where the claim sought to be presented to the state court is without merit. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (the district court would err if it allowed stay and abeyance where the claim is plainly meritless). The claim regarding Detective Fata's criminal conviction is one that is unlikely to warrant relief under existing Maryland law. In order to merit a new trial, newly discovered evidence must be evidence that, had it been available at trial, likely would have resulted in an acquittal. *See Campbell v. Maryland*, 821 A.2d 1, 18 (Md. 2003). "[E]vidence that has value only for purposes of testimonial impeachment does not qualify as 'newly discovered evidence' within the contemplation of the law governing motions for a new trial." *Jackson v. State*, 884 A.2d 694, 703 (Md. 2005); *see also United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (newly discovered impeachment evidence does not warrant a new trial). The information presented by Blake about Detective Fata's fraud charges is impeachment evidence that could have been used to challenge his credibility, but would not have established Blake's innocence. Blake is not entitled to stay and abeyance, and this claim is waived along with other unexhausted claims raised. *See Rhines*, 544 U.S. at 277; *Jackson*, 884 A.2d at 703.

## **Standard of Review**

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings." *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the

doubt. *Cullen v. Pinholster*, 563 U.S. 170, ---, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* --- U.S. ---, ---, 134 S. Ct. 1697, 1702 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).   A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis of § 2254(d)(1),   "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.*

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first

instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 599 U.S. 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

### Analysis

#### Ineffective Assistance of Trial Counsel

Blake's allegations of ineffective assistance of trial counsel pertain to questions his trial counsel posed and objections counsel failed to make with regard to a variety of testimony and other evidence. *See* Mem. in Supp. of Pet. 3–5. Relevantly, "Counsel does not perform below a professional standard by electing to pursue one trial strategy instead of another." *See Wilson v. United States*, No. PJM-12-1136, 2014 WL 1292224, at *3 (D. Md. Mar. 27, 2014). Moreover, "[t]he decision to interpose objections during trial is one of tactics and trial strategy." *Oken v.*

*State*, 681 A.2d 30, 49 (Md. 1996). I will consider each of Blake's allegations and the post-conviction court's disposition of each.

First, Blake alleges that trial counsel was ineffective by eliciting and failing to object to admission of "other crimes" evidence and prejudicial hearsay.  Mem. in Supp. of Pet. 3–5.  This claim concerns in part Detective Merrick's testimony about gang culture.  *Id.* at 4.  Blake claims that prior to Merrick's testimony, no evidence had been introduced indicating that he was a member of a gang.  *Id.*  He maintains that trial counsel should have objected to Merrick's testimony regarding "general gang culture and petitioners affiliation" on relevancy and hearsay grounds and that the failure to object permitted "the state [to] spin[] a web of unrelated murderous acts and associate[e] them to the petitioner with no linkage evidence," which unfairly prejudiced him in the eyes of the jury.  *See* App. for Leave to Appeal 5 (incorporated by reference into Mem. in Supp. of Pet. 4).  The post-conviction court observed that, rather than objecting to the testimony on relevancy grounds, trial counsel asked the trial court not to qualify Merrick as an expert on the topic and then cross-examined Merrick about his qualifications.  Cir. Ct. Mem. Op. & Order 11.  The court held that counsel's choice was to attempt to undermine Merrick's expertise on gang culture, and the post-conviction court found that this choice did not render his performance ineffective.  *Id.* at 12.

Second, Blake questions his counsel's competence because, during cross-examination of Merrick, trial counsel drew out hearsay evidence regarding possible connections between Blake and a man known as "Bloody Eyes," who is the nephew of Suge Knight, a notorious gang member.  App. for Leave to Appeal 6.  Specifically, counsel established that Merrick did not know what organization Blake belonged to, who sent him to Baltimore from California, and why he was sent.  *See* Cir. Ct. Mem. Op. & Order 12–13.  At the post-conviction hearing, counsel

testified that his strategy at trial was to establish that Blake was exaggerating his involvement with the Bloods when he spoke with police, and that his goal was to undermine what Blake had said about his gang membership.  The post-conviction court viewed the questioning and resulting testimony as fitting counsel's trial strategy, as it established that Merrick's information about Blake's involvement in the Bloods came mainly from Blake himself.  *Id*. at 13.  The post-conviction court concluded that the evidence brought out during cross-examination of Merrick did not constitute deficient performance by trial counsel.  *Id*.

Third, Blake claims that trial counsel should have objected to evidence introduced through a taped interview between Blake and Detective Fata that implicated Blake in the sale of heroin.  Blake asserts that counsel also should have moved to redact portions of the statement dealing with Blake's prior crimes.  The post-conviction court found that Blake inaccurately characterized the facts underlying this claim, as trial counsel moved "to suppress the tape recorded statement on voluntariness grounds  .  .  .  and by continually objecting to its introduction."  Cir. Ct. Mem. Op. & Order 14.  The post-conviction court further observed that once the objection was overruled and the evidence was admitted, counsel's failure to object yet again "might well have been a strategic decision."  *Id*. at 15.

Fourth, Blake alleges that trial counsel should have objected to evidence allegedly connecting him with two other murders (the Danny Boy and Bloody Jesus killings) and that his failure to do so rendered him ineffective.  Mem. in Supp. of Pet. 3–5.  This evidence came in through Wagner's tape recorded statement, and trial counsel objected to the introduction of her recorded statement in its entirety.  The post-conviction court concluded that Wagner's tape recorded statement was not "other crimes evidence," as Blake asserted, because it did not attribute either murder to Blake. *Id*.  There is no error in this conclusion.  *See* Md. R. 5-404(b).

The court also found that the basis for counsel's objection fell "squarely within trial counsel's authority to make tactical decisions."  Cir. Ct. Mem. Op. & Order 14.  It then concluded that Blake "failed to rebut the presumption that these decisions were reasonable by merely stating a fourth basis upon which Counsel could have objected."  *Id.*

Where, as here, trial counsel has chosen to question a witness or approach a witness's testimony in a certain way, or adopted a particular approach to other evidence as a matter of strategy, his failure to take a different approach does not render his assistance deficient.  *See Wilson*, 2014 WL 1292224, at *3. The post-conviction court's analysis of Blake's trial counsel's tactics is without error.  *See id*.  Therefore, it is not a basis for habeas relief.  *See* 28 U.S.C. § 2254(d)(1).

Additionally, the post-conviction court rejected Blake's contention that admission of the testimony from Merrick was subject to objection on the basis that prior criminal conduct may not be introduced to establish guilt of the offense being tried, because the notoriety of Suge Knight is not a bad act committed by Blake. Cir. Ct. Mem. Op. & Order 13.  The post-conviction court's conclusion that any objection on that basis would not have been sustained is also without error. *See* Md. R. 5-404(b).  This, also, is not a basis for habeas relief. *See* 28 U.S.C. § 2254(d)(1).

Blake also assigns error to trial counsel's failure to object to Wagner's counsel being allowed to sit beside her as she testified and "feed her every answer to the question posed." Mem. in Supp. of Pet. 3.  Blake asserts that Wagner's counsel was not the sworn witness "so she should not have been allowed to furnish Wagner the answers to prosecution's questions."  *Id*. at 3–4.   This claim does not appear to have been raised at post-conviction in the precise manner it is asserted here.  Rather, the post-conviction court's analysis of the claim was in the context of Blake's assertion that the *trial judge* committed error when he allegedly coerced Wagner into

testifying and allowed her attorney to sit next to her during her testimony.  Cir. Ct. Mem. Op. &
Order 21.  The post-conviction court found this claim to have been waived because no objection
was made at trial and this claim was not raised on direct appeal.  *Id.*  This conclusion is not in
error.  *See* Crim. Proc. § 7-106(b)(1)(i)(3).

Even if the post-conviction court had analyzed the claim in the context of an ineffective
assistance of counsel claim, it is without merit.  Counsel for one of Blake's co-defendants
objected to Wagner's attorney "over-conferring" with her during her testimony, and a bench
conference ensued.  Apr. 4, 2007 Ct. Tr. 166–68.  Following the bench conference, during which
Wagner's attorney explained that Wagner did not understand the questions as presented by the
State, the trial judge had Wagner's attorney leave the witness stand.  *Id.* at 168.  It was only after
Wagner's attorney left that any substantive testimony was presented.  Any further objection by
Blake's counsel would have been unnecessary and likely overruled.  Thus, counsel's tactical
decision not to object counsel did not constitute ineffective assistance.  *See Wilson*, 2014 WL
1292224, at *3.  No basis for federal habeas relief is stated.  *See* 28 U.S.C. § 2254(d).

<u>Ineffective Assistance of Appellate Counsel</u>

Blake claims appellate counsel was ineffective for his failure to raise a non-frivolous
claim.  Specifically, he asserts that the two claims raised were frivolous and the appeal should
have raised "many problems from trial that could have been reviewed under the Plain Error
Doctrine."  Mem. in Supp. of Pet. 4.  The issues Blake asserts should have been raised on appeal
include "other crimes, *Crawford*, *Brady*, [and] denial of severance pursuant to Md. Rules 4-252
and 4-253."  *Id.*  Blake alleges that he asked appellate counsel to raise these issues on appeal, but
was told they were appropriate for post-conviction and not direct appeal.  *Id.* at 5.  He states that

the advice was erroneous and caused waiver of meritorious issues, rendering appellate counsel ineffective. *Id.*

The post-conviction court correctly noted that "[a] presumption . . . exists that counsel was acting reasonably in raising certain issues and not raising others on appeal." Cir. Ct. Mem. Op. & Order 15. *See Oken*, 681 A.2d at 43. Blake's argument that his statement to police, which was challenged on appeal on *Miranda* grounds, should have been challenged on "other crimes" grounds was rejected by the post-conviction court. Cir. Ct. Mem. Op. & Order 15. The court pointed out that "[h]ad counsel appealed on 'other crimes' grounds as suggested by [Blake,] the appellate court would have had to review this claim under an abuse of discretion standard." *Id.* The post-conviction court further noted that the *Miranda* claim required a "more generous standard of review" and had the appellate court ruled in Blake's favor "would have led to the suppression of [Blake's] entire statement." *Id.* at 16. In contrast, if the "other crimes" argument was successful, only the portions of Blake's statement that involved other crimes evidence would have been suppressed. *Id.* Finally, the post-conviction correctly court noted that "appellate counsel is not required to raise every single non-frivolous issue" to comport with Sixth Amendment standards. *Id.* *See Jones v. Barnes*, 463 U.S. 745, 751–53 (1983) (citing Jackson, *Advocacy Before the United States Supreme Court*, 25 Temple L.Q. 115, 119 (1951)). The post-conviction court's conclusion that Blake failed to rebut the presumption that appellate counsel acted reasonably in the choice of grounds to raise on appeal is without error and federal habeas relief is unavailable on this claim. *See* 28 U.S.C. § 2254(d)(1).

Trial Court Error

Blake claims it was error for the trial court (1) to admit hearsay evidence and evidence of other crimes, violating his rights to due process and equal protection; (2) to instruct the jury on

30

"mere presence;" (3) to allow Wagner's pre-trial statement to go to the jury; and (4) to find the evidence was sufficient to sustain his convictions.   Each claim is addressed below.

   *1.   Due process and equal protection claims*

Blake claims that Detective Merrick's testimony regarding his video interview of an individual in California who told him that Blake had come to Maryland to organize and collect dues from gang members is "work product" and therefore hearsay, which should not have been admitted.  Mem. in Supp. of Pet. 2.  He further alleges that, because he had no opportunity to cross-examine the witness that Merrick interviewed,[19] admission of the evidence violates *Crawford v. Washington*, 541 U.S. 36 (2003).[20]  *Id.*  Additionally, he alleges that this evidence was the only evidence of motive for the crime.[21]  *Id.*  Blake also argues that it was improper to conclude that *Crawford* had no retroactive application, as it was decided before the date of his trial. *Id.*

The post-conviction court rejected this claim as unduly vague and without adequate factual basis.  Cir. Ct. Mem. Op. & Order 19.  In addition, the post-conviction court noted that Blake's trial counsel brought out this hearsay evidence through testimony in response to cross-examination.  *Id.*  The court observed that trial counsel explained that he brought out this evidence as a part of trial strategy to establish that Merrick did not know why Blake was in Maryland. The post-conviction court found that counsel's strategic decision was not

---

[19]   The "witness" Blake appears to refer to is "Bloody Eyes," the nephew of Suge Knight, who reportedly told Merrick that Blake was sent to Maryland for gang business.

[20]   *Crawford* held in relevant part that out-of-court statements by witnesses that are testimonial are barred by the Confrontation Clause unless the witnesses are unavailable and the defendant had a prior opportunity to cross-examine the witnesses.

[21]   Blake misstates the evidence regarding motive.  In his own statements to police, both before the crime took place and after his arrest, he gave police information regarding why he was in Maryland and his responsibilities regarding gang membership and the representation of the Bloods in Baltimore.

constitutionally deficient.  *Id.*  This conclusion is not in error.  *See Wilson*, 2014 WL 1292224, at

*3. Where, as here, the state court has denied relief on a federal claim on independent and

adequate state grounds, the claim is procedurally defaulted, and this Court may not revisit the

merits of the claim absent a showing of cause and prejudice or of actual innocence.  *See Coleman*

*v. Thompson*, 501 U.S. 722, 729 (1991) (a technically exhausted federal claim which was denied

by the state on either procedural or substantive state law grounds is procedurally defaulted).

Blake has not made such a showing; thus, this ground does not present a basis for relief under 28

U.S.C. § 2254.

> 2.  *Wagner's statement*

Blake asserts that the trial court abused its discretion by allowing the taped statement of

Jiordanna Wagner to be played for the jury.  Mem. in Supp. of Pet. 7.  In Blake's view, Wagner

never claimed she was afraid of him or his co-defendants; rather, she stated she was afraid of

going to jail and claimed she had been threatened by the police.  *Id*.  He concludes from this that,

because there was no evidence that he and his co-defendants intimidated Wagner, there was no

basis for admitting her tape-recorded statement to the jury.  *Id*.

The validity of admitting Wagner's tape-recorded statement was reviewed on direct

appeal.  There, Blake asserted it was error to admit the tape-recorded statement absent a

preliminary finding that Wagner's asserted memory loss was a contrivance.  *Blake v. Maryland*,

No. 989, slip op. at 11.  The appellate court found that the trial court was not required to make

such a specific finding and that the judge's reference to *Nance v. State*, 629 A.2d 633 (Md.

1993), was adequate indication that the tape-recorded statement was being admitted as an

exception to the hearsay rule permitting admission of an inconsistent statement where memory

loss is feigned by the witness.  *Id.* at 12–13 (citing *Corbett v. State*, 746 A.2d 954, 960–61 (Md.

Ct. Spec. App. 2000)).   The appellate court further noted that the determination whether a witness is feigning memory loss is a credibility determination within the discretion of the trial court.   *Id*. at 13–14.

To the extent Blake asserts there was no evidence of witness intimidation, it does not obfuscate the basis upon which the statement was admitted.   There is no requirement that a witness's feigned memory loss must be traced back to a party's intimidation of the witness. Moreover, this claim was denied on the basis of well-established state law that, when a witness claims memory loss, the witness's former inconsistent statements from when he or she still remembered the event are admissible.   *See Nance*, 629 A.2d 633; *Corbett*, 746 A.2d at 960–61. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.   In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."   *Estelle v. McGuire*, 503 U.S. 62, 67–68 (1991). Thus, this claim does not present a basis for federal habeas relief. *See* 28 U.S.C. § 2254.

### 3.   Sufficiency of evidence

Blake claims that the evidence presented was insufficient because the uncorroborated testimony of a co-defendant is not enough to support a guilty finding and, notwithstanding that testimony, there was no physical or scientific evidence presented to establish his guilt.   Mem. in Supp. of Pet. 7.   He further contends that the cumulative effect of trial counsel's errors and the trial court's errors "severely prejudged" him and requires award of habeas relief.   *Id*.   Blake raised this claim in post-conviction proceedings, but did not raise it on direct appeal.   The post-conviction court denied relief on the claim "because it concerns a matter for which post-conviction may not be granted."   Cir. Ct. Mem. Op. & Order 26.   It is true that a Maryland post-

conviction court cannot grant relief based on sufficiency of the evidence. *See Johnson v. Warden*, 295 A.2d 820, 823 (Md. Ct. Spec. App. 1972); Crim. Proc. § 7-107(a). Thus, the claim was denied on adequate state law grounds, is procedurally defaulted, and does not present a claim upon which this Court may grant federal habeas relief. *See Coleman*, 501 U.S. at 729.

Prosecutorial Misconduct

Blake claims that the prosecution failed to disclose DNA reports, knife evidence, and the name of an alternative suspect in the case (Mem. in Supp. of Pet. 1) (*Brady* claim); made improper closing arguments by shifting the burden of proof and providing misleading, false argument (*id*. at 5); and tampered with his alibi witness (*id.* at 9). Each of these claims is addressed below.

*1. Brady claim*

Blake claims that the State failed to produce a knife found at the scene and DNA results on blood found at the scene. Mem. in Supp. of Pet. 1. He also claims that that the State failed to disclosure the name of an alternative suspect. *Id.* With regard to the knife, Blake had argued before the post-conviction court that, not the knife itself, but the results of a DNA test on the knife were withheld. *See* Cir. Ct. Mem. Op. & Order 23. To the extent he raises a different argument now, it is waived. *See Ex parte Hawke*, 321 U.S. 114, 116–17 (1944); Resp. to Ct. Order 1 (waiving review of any claims that this Court finds unexhausted). As for the DNA results on blood found at the scene, Blake claims that the results showed that the blood was dog's blood, and that blood evidence introduced at trial was false. Mem. in Supp. of Pet. 1. He claims that, had the prosecution made these reports available, the outcome of the trial would have been different, because the evidence as presented implied that Blake had participated in a brutal beating of the victim. *Id.*

34

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to prevail on a *Brady* claim, it must be established that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). A guilty finding only must be overturned if suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

The post-conviction court rejected this claim as unsubstantiated as it pertained to DNA results because there was no evidence that the State had DNA test results from the crime scene and intentionally withheld them until the end of trial. Cir. Ct. Mem. Op. & Order 20. At the post-conviction hearing, testimony revealed that DNA testing on blood collected after Raymond Kelly's arrest, during which his dog was shot and killed, revealed *that* blood to be dog's blood. There was no other DNA testing on the blood evidence found at the murder scene as there was not enough of it found because the area had been cleaned with bleach. The "blood evidence" submitted at trial was simply the testimony of the crime lab technician stating that chemical testing revealed there was blood present in the basement where two witnesses saw the victim being assaulted, and the testimony of Detective Fata that a pillar in the front room was believed

to have bloody prints on it and blood swabs were taken from the kitchen.  The post-conviction's conclusion was without error, and this claim is wholly without merit.  It does not provide a basis for habeas relief.  *See* 28 U.S.C. § 2254.

As for the alleged withholding of a knife and another suspect's name, the post-conviction court did not err in its conclusion that these were "bald allegation[s]," *see* Cir. Ct. Mem. Op. & Order 23–24, as Blake did not provide the post-conviction court with any evidence to substantiate his claims.  *See id.*  Consequently, there is no basis for habeas relief on these grounds.  *See* 28 U.S.C. § 2254.

2.  *Improper arguments during closing*

Blake claims that "[s]everal times during trial the State made burden shifting comments that caused irreversible damage" to him.  Mem. in Supp. of Pet. 5.  The statements Blake relies on, made during closing by the State's Attorney, are that "the defense will have to convince you that both witnesses were beaten, forced, coerced, whatever on they're going to pick into saying the same thing" and "as your honor instructed and as I've alluded to several times, the defense will have to show all of that, that the police lied, coerced em (sic), beaten em (sic)  got them to say the same things."  *Id.*  Blake maintains that the corrective jury instruction given by the judge in light of these statements was not enough, and a mistrial should have been declared.  *Id.* at 6.

Blake raised this claim in post-conviction proceedings.  The post-conviction court found that he waived this claim because he did not raise it on direct appeal.  Cir. Ct. Mem. Op. & Order 26.  Where a claim is denied on procedural grounds by the state post-conviction court, it is procedurally defaulted and this Court may not reach the merits of it.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  Additionally, although the post-conviction court found that "[t]he issue of ineffective assistance of trial counsel on the ground of failing to object is not waived," it

36

concluded that Blake had "not overcome the presumption that this was a tactical decision."[22] Cir. Ct. Mem. Op. & Order 26. The post-conviction court's conclusion is not erroneous, *see Oken*, 681 A.2d at 49; *see Wilson*, 2014 WL 1292224, at *3, and therefore is not a basis for habeas relief, see 28 U.S.C. § 2254.

   *3. Use of false testimony*

   Blake claims the State knowingly used false testimony in its case against him. Mem. in Supp. of Pet. 6. First, he asserts that Kelly provided perjured testimony when he was allowed to testify that he was not a gang member and points to Kelly's arrest record. *Id*. Blake states that Kelly "was clearly dressed in full gang attire at the time of his arrest and in possession at his home there was gang paraphernalia confiscated." *Id*. He further claims that this false testimony was not corrected by the State at trial. *Id*. The post-conviction court rejected this claim as a "bald allegation" for which Blake offered no evidence during the hearing and further observed that "there is little else on the record indicating that the state knowingly used perjured testimony." Cir. Ct. Mem. Op. & Order 26.

   The post-conviction court's analysis is without error. The State was not obligated to impeach its own witness, and there is no evidence that the State withheld information from the defense regarding Kelly's past criminal record. Indeed, Kelly's prior criminal history was used to impeach him on cross-examination. Apr. 5, 2007 Ct. Tr. 66–67. Additionally, Blake's counsel and counsel for his co-defendants used the presence of gang paraphernalia in Kelly's house, including the Samurai sword, and his apparent apathy about Randolph being murdered in his basement as a further basis to impeach his credibility. *Id*. at 68–73.

---

[22]   The post-conviction court addressed the claim that trial counsel was ineffective for failing to ask for a mistrial and observed that it was "entirely plausible that [trial counsel] believed that the trial was going relatively well for [Blake] and that another trial may have led to a worse outcome for [Blake]." Cir. Ct. Mem. Op. & Order 17.

Blake also claims that the State provided misleading and false evidence at trial during closing argument when the jury was told that Wagner was never charged in Blake's case. Mem. in Supp. of Pet. 6. Blake states that Wagner was charged as an accessory in his case as well as an unrelated case and that her immunity deal was contingent upon her testimony in Blake's case. *Id*. Blake raised a slightly different claim regarding Wagner in post-conviction proceedings, where he claimed prosecutorial misconduct on the basis that Wagner was coerced and pressured into testifying. Cir. Ct. Mem. Op. & Order 24–25. The post-conviction court rejected this claim after observing that it actually was the trial judge, not the State's Attorney, who ordered Wagner to testify. *Id*. at 25. The court also observed that Blake had cited "no authority for the proposition that it is prosecutorial misconduct to call a cooperating witness." *Id*. To the extent the claim raised in this Court is the same one raised at post-conviction, the state court's analysis is without error. To the extent Blake is asserting a different claim regarding Wagner's testimony, it is waived as unexhausted. *See* Resp. to Ct. Order 1 (waiving review of any claims that this Court finds unexhausted); *Ex parte Hawke*, 321 U.S. 114, 116–17 (1944).

## Conclusion

Blake has failed to satisfy the standard of proof entitling him to federal habeas relief. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has

been no substantial showing of the denial of a constitutional right, a certificate of appealability

shall not issue.  *See* 28 U. S.C. § 2253(c)(2).




12/29/2015                                     _____/S/_____
Date                                           Paul W. Grimm
                                               United States District Judge